KONECRANES, INC., d/b/a Crane Pro Services, Inc., Plaintiff,

v.

SCOTT SINCLAIR and Service Crane, LLC, Defendants.

No. CV 03–1782–PA.

United States District Court, D. Oregon.

Jan. 5, 2004.

Elizabeth A. Schleuning, Lisa Cohen Greenfield, Schwabe Williamson Wyatt, PC, Portland, OR, for Plaintiff.

Scott Sinclair, Service Crane LLC, Beaverton, OR, pro se.

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

PANNER, District Judge.

Plaintiff Konecranes, Inc., dba Crane Pro Services, Inc. ("Konecranes") brings this diversity action against defendants Scott Sinclair and Service Crane, LLC. On December 30, 2003, following a hearing, I denied Plaintiff's motion for a temporary restraining order. This opinion explains that ruling.

### Background

Plaintiff manufactures and services construction cranes, and supplies spare parts. Konecranes has "over 65 locations across the United States," plus Canada, Mexico, Europe, and Asia. *See* http://www.kciamericas.com (listing locations).

Defendant Sinclair managed Plaintiff's Portland branch. The Complaint alleges that Sinclair commenced his employment on or about February 7, 2001, and resigned on or about September 6, 2003. The parties offer very different accounts of the circumstances surrounding his departure.

Two weeks after he resigned, Sinclair reportedly incorporated defendant Service Crane, LLC, and is now competing with his former employer. Plaintiff contends that Sinclair is violating a non-compete agreement, using Plaintiff's trade secrets and materials, confusing customers, and otherwise competing unfairly and unlawfully. Plaintiff seeks a temporary restraining order ("TRO"), permanent injunctive relief, plus compensatory and punitive damages.

### Legal Standards

A TRO is intended to preserve the status quo until the court can rule upon the application for preliminary in-

junction. Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 2951 (1995). The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Id.* These are not separate tests, but the outer reaches "of a single continuum." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980). Serious questions are those sufficiently substantial to warrant further consideration by the court and to present fair ground for litigation. *See Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991). If the balance of hardships tips decidedly toward the plaintiff, less likelihood of success on the merits is required. *Wilson v. Watt,* 703 F.2d 395, 399 (9th Cir.1983). The court must also consider the public interest, if applicable. *American Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 965 (9th Cir. 1983).

### Discussion

### A. *Likelihood of Success*

#### 1. *Validity of the Non–Compete Agreement*

ORS 653.295 provides that:

(1) A noncompetition agreement entered into between an employer and employee is void and shall not be enforced by any court in this state unless the agreement is entered into upon the:

(a) Initial employment of the employee with the employer; or

(b) Subsequent bona fide advancement of the employee with the employer.

■ "Initial employment" has been strictly construed. Any non-de *minimis*

delay, between the commencement of employment and when the agreement was signed, is fatal. *See IKON Office Solutions, Inc. v. American Office Products, Inc.,* 178 F.Supp.2d 1154, 1159–61 (D.Or. 2001) (court found no Oregon decision enforcing non-compete agreement signed more than 3 days after employee commenced work, and holding that 17 days was too long an interval), *aff'd,* 61 Fed. Appx. 378, 2003 WL 1818589 (9th Cir.2003) (unpublished); *Perthou v. Stewart,* 243 F.Supp. 655, 659 (D.Or.1965) (six-day delay too long); *Miller v. Kroger Co.,* 2001 WL 34043439 (D.Or.2001) (seven-week delay too long).

■ Sinclair signed the non-compete agreement 16 days after his employment commenced.[1] Sinclair claims he did so under duress, but the point is academic, as the agreement was not signed at the "initial employment of the employee with the employer." No meaningful distinction can be drawn between the 16 day interval in this case, and the 17 day interval that was too long in *IKON*. The plain language of the statute also refutes any attempt to circumvent this restriction by arguing that a new term of employment begins each day that an at-will employee comes to work.

Plaintiff contends Ohio law applies because Plaintiff inserted a choice-of-law clause in the non-compete agreement. Plaintiff also reasons that, because this is a diversity action, the court should decide this case as if it were an Ohio court. That's not entirely correct.

■ A federal court sitting in diversity applies the substantive law of the *forum* state, including the forum state's choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.

---

**1.** The date alleged in the Complaint (February 23, 2003) is two years and 16 days after his employment commenced, but that appears to be a clerical error.

1477 (1941), as it believes the highest court of the state would apply it. *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 692 (9th Cir.1992). The forum state here is Oregon, not Ohio.

■ How the Oregon Supreme Court would decide this case seems clear from the language of the statute: "A noncompetition agreement entered into between an employer and employee is void *and shall not be enforced by any court in this state* " unless it meets the listed requirements. ORS 653.295(1) (emphasis added). That is an unequivocal statement of public policy.

Oregon has a sufficient interest in this matter to justify applying its own law. Sinclair is a resident of Oregon. At all relevant times, he worked in Plaintiff's Portland branch. He is attempting to compete within Oregon, and Plaintiff is seeking to enjoin competition within Oregon. An Oregon employer cannot circumvent Oregon laws designed to protect Oregon workers simply by decreeing that the laws of another state will apply.[2] This was not a contract negotiated between two businesses, or an independent contractor, who may have greater leeway to establish their own terms.

Sinclair's non-compete agreement may have a second fatal defect. A noncompetition provision in an employment contract is a covenant in restraint of trade. *North Pac. Lumber Co. v. Moore*, 275 Or. 359, 364, 551 P.2d 431 (1976). "Three things are essential to the validity of a contract in restraint of trade[:] (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must come on good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public." *Id.*

The non-compete agreement purports to prevent Defendant Sinclair from competing for a period of 18 months in "[a]ny area in which KCI Konecranes, Inc. is engaged in business." Plaintiff claims to conduct business within a 150 mile radius of Portland. That would effectively bar Sinclair from working in the same industry in the principal industrial areas of Oregon and Washington. In addition, Konecranes has at least 65 locations in the United

---

**2.** *Machado–Miller v. Mersereau & Shannon, LLP*, 180 Or.App. 586, 43 P.3d 1207 (2002), is not to the contrary. The Plaintiff brought a malpractice action claiming her attorney erred, in a prior action heard in Oregon federal court, by not arguing for application of California law. The non-compete agreement specified that Oregon law applied. The agreement was enforceable under Oregon law, but not under California law. The Court of Appeals predicted that the federal court would have applied Oregon law, not California law. Although this particular employee was stationed in California, Oregon had a strong interest in applying its laws. In addition, the employer was an Oregon corporation, and the employee had extensive contacts with Oregon. Another, unspoken factor, was that the action was adjudicated in Oregon; when the question is close, courts typically apply the law of the forum state.

The panel did state, in dictum, that ORS 653.295 articulates the fundamental interest of "protecting the rights of Oregon citizens to choose the terms of their own employment relations free from government interference," "promotes stable employment relations," and "protects Oregon employers from loss of employees in whose training they have invested considerable resources." *Id.* at 596–97, 43 P.3d 1207. The panel cited no authority for this *ipse dixit* statement, and it seems contrary to the plain language of the statute, which restricts, rather than promotes, use of non-compete agreements. Regardless, *Machado–Miller* is not a decision by Oregon's highest court, the statement is dictum, and the non-compete agreement at issue here is void under ORS 653.295.

States alone. The non-compete agreement is not limited to Plaintiff's Portland branch, or to specific tasks, or to soliciting customers that Sinclair serviced while employed by Plaintiff. The agreement prohibits Sinclair from working in any capacity, directly or indirectly, in "any business activity competitive with the business. of KCI Konecranes, Inc."

In deciding whether a non-compete agreement is reasonable, an important consideration is whether it merely restricts the former employee from luring away specific accounts (*i.e.,* those he serviced while employed) or whether it restricts the employee from competing at all. In the former instance, the employee might gain an unfair advantage, such as goodwill and inside information, derived from his prior contacts with the client. It is much harder to justify barring a former employee from competing altogether. The latter also is contrary to the public interest, and makes it difficult for the employee to pursue his livelihood. Thus, a restriction that says a stock broker can't solicit his former clients for one year might be upheld, but a restriction that says he can't work in the industry altogether might be unreasonable.

The Complaint here seeks to bar Sinclair from contacting any "current or potential customer of [Plaintiff] in any area in which [Plaintiff] does business . . ."

A further concern is the size of the potential client universe. Unlike automobiles, there are a limited number of customers who need their construction crane serviced. If Sinclair is barred from contacting them, he probably is out of business.

My preliminary conclusion[3] is that these restrictions are excessive, at least for a mere branch manager such as Sinclair. Courts ordinarily do not re-write the con-

tract for the parties. Employers drafting non-compete agreements might also be encouraged to overreach, if they know the worst that could happen is the court will strike the most egregious provisions. The better approach is to void unreasonable agreements. *See Lelouis v. Western Directory Co.,* 230 F.Supp.2d 1214, 1224–25 (D.Or.2001). If employers know that overreaching may result in the agreement being void, they will make sure, in drafting the agreement, that the terms are fair to both sides.

In summary, the non-compete provisions in this contract probably are not enforceable in Oregon. The likelihood of Plaintiff prevailing on this claim is low.

### 2. *Trade Secrets*

█ Plaintiff also contends Sinclair is violating the Ohio Trade Secrets Act. However, all relevant acts occurred in Oregon, so the Oregon Trade Secrets Act probably applies.

The "quote" letters sent by Sinclair do not appear to be confidential trade secrets. Those form letters reportedly are sent to anyone requesting a quote. Using similar letters might lead to some confusion, but that is a different issue.

Plaintiff also contends its customer list is a trade secret, and suspects Sinclair copied that list. He denies this. Regardless, the issue is more complex than Plaintiff's brief suggests. *See IKON,* 178 F.Supp.2d at 1167–70.

In *IKON,* the defendant did not steal a customer list, but he did call on customers he knew from years of working in the industry, some of whom he met while employed by the plaintiff. However, anyone with a basic knowledge of the industry could quickly identify the major customers for that product in the region. Further-

---

**3.** I emphasize that, at this early stage of the case, all conclusions stated are tentative and

subject to revision after the matter has been more fully briefed.

more, as there is no time limit on the trade secrets law, treating customer names as a trade secret would have amounted to a "long-term non-competition requirement, but without any of the restrictions that the Oregon Legislature has imposed upon non-competition agreements." *Id.* at 1168. Given those facts, Judge Jelderks declined to extend trade secret status to the customer names. *Id.*

The trade secrets claim here appears to suffer from the same defects. The market for construction cranes in Portland is fairly limited. Plaintiff refers to just 201 accounts in the Portland office (which allegedly covers a 150 mile radius from Portland). If someone with a general knowledge of the industry could quickly identify the likely candidates using basic tools such as the Yellow Pages, a Chamber of Commerce Directory, or construction industry publications, then those names probably do not qualify for protection as a trade secret.

As in *IKON,* no time limit is placed on the trade secret provisions in the non-compete agreement. The 18–month limit applies only to the non-compete clause itself. If Sinclair is forbidden to contact anyone whose name he learned while employed by Plaintiff, this may amount to a lifetime ban on working in that industry in Oregon and Washington. If the knowledge Sinclair gained while employed by Plaintiff is considered confidential, he might also be barred from working in the industry entirely, since Plaintiff has offices all over the United States and in other nations as well.

Plaintiff concedes it has no proof, at this point, that Sinclair actually took a customer list or other confidential information with him. It just suspects he did. Plaintiff also provides almost no information regarding this customer list, how it was compiled, or whether the same information could easily be acquired from other sources, such as public records or a list of local subscribers to Crane World magazine.

Plaintiff contends the list is entitled to protection because access to the list is restricted by Plaintiff. That is one factor, but not the only factor.

As yet, Plaintiff has not made a sufficient showing to warrant injunctive relief.

### 3. *Conversion*

■ Plaintiff contends Sinclair must have either "copied or memorized [Plaintiff's] customer account information," which it construes as a conversion. Plaintiff cites no authority for the proposition that memorizing is a "conversion." Plaintiff also contends Defendant "converted" accounts by persuading customers to do business with him. However, conversion is a tort against possession. One cannot possess (or convert) an "account," any more than one could possess (or convert) someone's affections. Rather, it is a relationship.

Again, Plaintiff has not made a sufficient showing to warrant injunctive relief.

### 4. *Duty of Loyalty*

■ Plaintiff contends an employee has a duty of loyalty to his employer that continues even after termination of the employment. Sinclair was not a director who owed a duty to the shareholders, or an officer of the corporation. He was a local branch manager of a multi-national corporation. Ordinarily, absent a valid non-compete agreement, an employee can resign in the morning and be working for a competitor the same afternoon. Unless Plaintiff can point to some Oregon authority supporting its position, this claim may not go far.[4]

---

**4.** Indeed, employees have often sought to establish a fiduciary relationship with their em-

### 5. *Deceptive Trade Practices*

Plaintiff contends that Sinclair is violating an Ohio statute governing deceptive trade practices, by causing likelihood of confusion or misunderstanding as to the source of goods. However, Plaintiff offers no evidence that Sinclair is doing business in Ohio.

■■■ Oregon's Unlawful Trade Practices Act applies only to goods or services "which are or may be obtained primarily for personal, family or household purposes." ORS 646.605(6). Few families keep a construction crane in their backyard.

### 6. *Intentional Interference With Business Relations*

Plaintiff again attempts to plead an Ohio tort and cites only Ohio law. However, this claim is not for breach of contract, the choice of law provision is inapplicable, and Oregon law governs.

■■■ The elements of a claim for intentional interference with economic relations are: (1) intentional interference with a proposed or existing economic relationship; (2) with an improper motive or by use of improper means; and (3) damage beyond the fact of interference itself. *Willamette Dental Group v. Oregon Dental Service,* 130 Or.App. 487, 498, 882 P.2d 637 (1994).

■■■ Plaintiff cites no authority that merely competing for customers constitutes "intentional interference with business relations." Oregon recognizes the "business competitor's privilege":

ployer, so they could assert torts such as "negligent misrepresentation." To date, that argument has not prevailed in Oregon. *See Conway v. Pacific University,* 324 Or. 231, 924 P.2d 818 (1996) (employer owes no special duty of care to employee that could support a claim for negligent misrepresentation).

One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if

(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

(b) the actor does not employ improper means, and

(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

(d) the actor's purpose is at least in part to advance his interest in his competition with the other.

*North Pacific Lumber,* 275 Or. at 369, 551 P.2d 431.

Plaintiff has not alleged that Sinclair tortiously induced anyone to breach a contract with Plaintiff. Rather, Plaintiff asserts that Sinclair should not be competing for business at all, because of the non-compete agreement. Even assuming that agreement were valid (and I doubt it is), it is questionable whether the breach of a non-compete agreement is itself a tort. *Cf. Georgetown Realty v. Home Ins. Co.,* 313 Or. 97, 104, 831 P.2d 7 (1992) (a tort claim usually must arise from some duty "independent of the terms of the contract.")[5]

Plaintiff's best argument may be that Sinclair allegedly caused likelihood of confusion, or used confidential information, and thus employed "improper means." At the moment, however, here is insufficient evidence of that in the record. Ironically, the proposed TRO would prohibit Sinclair

**5.** *Volt Services Group v. Adecco Employment Services, Inc.,* 178 Or.App. 121, 35 P.3d 329 (2001), does not hold otherwise. In *Volt,* the defendant allegedly induced temporary employees to breach their non-compete agreements with the plaintiff, and also violated what the panel construed as an independent standard of conduct.

from telling people that he is no longer associated with Plaintiff. That could give someone the impression that Plaintiff is more concerned with preventing competition than preventing confusion.

### B. *Balance of Hardships and Other Relevant Factors*

To date, Plaintiff has not shown a probability of success on the merits. Nor has Plaintiff shown that failure to grant the injunction will cause Plaintiff irreparable injury that cannot be redressed by damages. The balance of hardships also tips in favor of Defendants. If I grant the proposed injunction, Defendants will be out of business. Plaintiff points to a general public interest in the enforcement of contracts, but there is countervailing public interest in promoting competition and free enterprise. Plaintiff also contends that no third party will be harmed by the injunction, but that ignores the interests of companies who want Defendants to service their cranes.

Even if I were inclined to grant preliminary injunctive relief to Plaintiff, the amount of the bond would be far greater than the $5,000 suggested by Plaintiff. Liability for a wrongful injunction is generally limited to the amount of the injunction bond, even if actual damages are greater. *See Buddy Systems, Inc. v. Exer–Genie, Inc.*, 545 F.2d 1164, 1167–68 (9th Cir.1976). The Complaint alleges that over $75,000 is in dispute, and the accounts at issue are worth at least $313,000.

Under the circumstances, an expedited court trial on the merits seems the best way to resolve this matter, assuming the parties cannot resolve it among themselves.

### Conclusion

Plaintiff's motion (# 3) for a temporary restraining order is denied. A court trial is set for January 29, 2004, at 1:30 p.m. Discovery, if any, may begin immediately.

IT IS SO ORDERED.